UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:                                              Case Number: 20-12220-7

    MARK A. LEDIN and
    DEBRA L. LEDIN,

           Debtors.

    PATRICK S. LAYNG,
    UNITED STATES TRUSTEE,

           Plaintiff,
        v.                                    Adversary Number:  21-9

    MARK A. LEDIN and
    DEBRA L. LEDIN,

           Defendants.

## <u>DECISION</u>

Mark Ledin ("Mark") and Debra Ledin ("Debra") (collectively, the "Ledins") filed a voluntary Chapter 7 petition. The Ledins appeared at the first meeting of creditors on October 1, 2020 (the "341 Meeting"). An amended Summary of Assets and Liabilities was filed on December 30, 2020. The United States Trustee (the "UST") conducted a Rule 2004 Examination of the Ledins on February 7, 2021 (the "Rule 2004 Exam").

This adversary proceeding seeks denial of the Ledins' discharge under sections 727(a)(2)(B) and (a)(4). The Ledins deny the allegations. They claim they provided the necessary information to their prior counsel, who did not

adequately include the information on their schedules, petitions, and

statements.

### BACKGROUND

The Ledins' residence is at 1713 County Highway A, Ashland, Wisconsin.

Debra works as a registered nurse. While unemployed, Mark has a Bachelor of

Science degree in medical technology.

Mark holds a one-fifth interest each in two different properties. One is a

cabin in Ashland County, Wisconsin ("Cabin"). The other is a house in Ashland

("Ashland Property"). Neither of these properties were disclosed on the Ledins'

schedules or statement of financial affairs. No mention of either was made at

the 341 Meeting.

The Cabin:

- The Cabin originally belonged to Mark's father.

- In 2011, it passed to Mark and his four siblings in equal shares
  through a quitclaim deed.

- The Cabin is used by the Ledins and Mark's siblings for vacations
  and day trips.

- All the siblings contribute money to the maintenance and upkeep
  of the Cabin. These contributions were not included on the
  schedules.

- The Cabin was the subject of an accreted land dispute. The dispute
  was resolved by an Agreement for Accreted Land in 2012. Mark
  signed the Agreement as an owner in 2012.

- Some form of dispute may exist between a tribe, the Ledins, and
  owners of other cabins on the accreted land.

The Ashland Property:

- Belonged to Mark's mother and father.

- When Mark's father passed away, it was suggested the property be transferred to Mark and his siblings with a life estate to his mother.

- The Ashland Property was conveyed to Mark and his four siblings in equal shares by quitclaim deed.

- His mother lived in that house with Mark's brother, Brian Ledin ("Brian"), until her death.

- Brian has done work on the Ashland Property. Since his mother's death, Brian has been solely responsible for insurance and real estate taxes on the property. The Ledins no longer contribute to or receive any money from the Ashland Property.

- They consider the property to belong to Brian.

- Although they knew paperwork was needed to transfer Mark's interest to Brian, they took no steps to do so.

- Mark says he did not see a deed before the bankruptcy.

Mark's interests in these properties were not disclosed by the Ledins on their schedules. Nor were the interests disclosed at the 341 Meeting. After discovery of the interests in these properties, Trustee Parrish Jones ("Jones") moved for turnover of the two properties. Almost three weeks later, the Ledins filed an amended Schedule A/B disclosing the interests.

In mid-January, Jones and the Ledins stipulated (i) to a turnover of the interests in the properties,  and (ii) that the interests are property of the estate. The Ledins also agreed not to claim exemptions in the properties.

## DISCUSSION

The primary benefit of filing a Chapter 7 bankruptcy is that the discharge gives the debtor a "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003). But this privilege is reserved for the "honest but unfortunate debtor." *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). The Bankruptcy Code lists several exceptions that deny the "fresh start" and privileges of discharge to dishonest debtors. 11 U.S.C. § 727(a). The burden of proving a ground for objection to discharge is on the objecting party. Fed. R. Bankr. P. 4005; *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983) ("[T]he ultimate burden of proof in a proceeding objecting to a discharge lies with the plaintiff.").

The UST must establish grounds for denial of discharge under 11 U.S.C. § 727(a) by a preponderance of the evidence. *In re Scott*, 172 F.3d at 966–67. In bankruptcy, "exceptions to discharge are to be construed strictly against a [moving party] and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). Denial of discharge is a harsh remedy reserved for the truly pernicious debtor. *Layng v. Garcia (In re Garcia)*, 586 B.R. 909, 916 (Bankr. N.D. Ill. 2018).

Proof of conduct satisfying any subsections of 727(a) is enough to justify a denial of discharge. *See Farouki v. Emirates Bank Int'l*, 14 F.3d 244, 250 (4th Cir. 1994). The UST has alleged three grounds for denial of discharge under section 727(a): Concealment of Property of the Estate (§ 727(a)(2)(B)), False

4

Oath on Bankruptcy Schedules (§ 727(a)(4)), and False Oath at Section 341

Meetings of Creditors (also § 727(a)(4)).

### A. <u>Count I:  Denial Of Discharge Under 11 U.S.C. § 727(a)(2)(B)</u>

Section 727(a)(2)(B) provides that the court shall grant the debtor a

discharge unless

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing of the petition.

Broken down, section 727(a)(2)(B) says the debtor will not receive a

discharge if the plaintiff proves all four of these elements: (1) the debtor

transferred or concealed property; (2) such property constituted property of the

estate; (3) the transfer or concealment occurred after the filing of the

bankruptcy petition; and (4) the transfer or concealment was made with the

intent to hinder, delay, or defraud a creditor or officer of the estate charged

with custody of the estate property. *See Layng v. Pansier (In re Pansier)*, 613

B.R. 119, 143-44 (Bankr. E.D. Wis. 2020), *appeal dismissed sub nom. Pansier

v. Layng*, No. 20-C-221, 2020 WL 1492984 (E.D. Wis. Mar. 27, 2020).

### 1. *The Debtor Transferred or Concealed Property.*

The first element requires a finding that the Debtors transferred or

concealed property. "Concealment consists of failing or refusing to divulge

information to which creditors were entitled" or withholding knowledge or

information required to be disclosed by law. *In re Pansier*, 613 B.R. at 144

(quoting *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R.

211, 228-29 (Bankr. N.D. Ill. 2003) (internal quotation marks omitted)). The Seventh Circuit has held that "concealment" includes "preventing discovery" or "fraudulently transferring or withholding knowledge or information required by law to be made known." *In re Scott*, 172 F.3d at 967.

A concealment will also be found "when a debtor purports to transfer an asset, making it appear to the world that he no longer owns it, but in fact retains an interest in the asset." *In re Holstein*, 299 B.R. at 229. In addition, "[e]ven when the debtor does transfer an asset, there may be a concealment if he continues to use the asset as his own." *Id.* (citing *Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127, 128 (7th Cir. 1981) (per curiam) ("transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment")).

The one-fifth ownership interests in the Cabin and Ashland Property were not disclosed on the bankruptcy schedules. No mention of those interests was made at the 341 Meeting. The payments the Ledins had been making for cabin upkeep were not included in the schedule of expenses. When asked about the direct deposits from Debra's paycheck to unidentified bank accounts, she said they were contributions for upkeep of a cabin or the Ashland Property. And she said they didn't own these properties. She later reconfirmed, in writing, that the Ledins did not have an ownership interest in the Cabin. (ECF No. 32-4.)

The concealment continued at the Rule 2004 Exam. Debra said they simply visited the Cabin a week a year and on day trips. She says she didn't

think about ownership of the Ashland Property because "Brian lived there." Only when pressed did she admit the Ledins had talked about transferring the Ashland Property to Brian but had not done so. At her deposition, she said she only mentioned the Cabin to her prior attorney because it was in Mark's family, not because she believed she or her husband owned it. (ECF No. 32-21 at 29, line 7.) She claims the attorney looked it up on some website and said he thought it belonged to Brian. She didn't attempt to check or follow up.

Debra gathered the information to prepare the schedules. She says she reviewed everything before it was filed, although it was "overwhelming" to her. At trial, she explained she didn't disclose the interest in the Cabin because she thought the word interest simply meant "where we go." Besides, she says it was in the family and there was litigation so it wasn't clear whether they really owned it. Since no one asked about the Cabin before the turnover motion, she didn't bring it up. After her attorney died, the explanation for failing to disclose at the 2004 Exam expanded to be that her lawyer was sitting there and she "felt bad" saying she had told him about the Cabin. (ECF No. 32-21 at 13, lines 5-11.)

Mark's explanation for not listing the Cabin was that they inherited his father's interest, but since he didn't have "official word" they owned it there wasn't any apparent need to disclose. At first he denied seeing the Agreement he signed as an owner. (ECF No. 32-22 at 10, line 9.) When asked about attending owners' meetings related to the Cabin, he said that only landowners or people with cabins attended the meetings. Even so, he maintained they were

not owners but merely squatters while the land dispute continued. He considered the Cabin to be Brian's. Conceding his name was on the deed and as an owner on the Agreement, Mark had another excuse for not disclosing his interest in the Cabin. He said that claiming ownership was not actually the same as owning the Cabin. His testimony lacked all credibility about the Cabin.

Variations on the story were that the Cabin was just a family place they sometimes used. Then Mark knew he probably inherited an interest but never saw a deed. Next, there was the land accretion dispute but no deed. And signing an Agreement as an owner in the dispute didn't mean Mark was really an owner.

Those were not the only stories presented about the lack of disclosure. Similar changing excuses were given for the Ashland Property.

Debra said she didn't tell their lawyer about the Ashland Property or even think about it simply because Brian lived there. Debra says that it was inherited but finding deeds that transferred the interest was a surprise. She knew there could be an interest but wanted it to go to Brian and "didn't know ownership would change."

Despite getting an interest in the Ashland Property when his father died, after his mother's death Mark says he wanted nothing more to do with it. So he says he considered it Brian's property although acknowledging he never transferred his interest. This explanation differed from his deposition testimony. There he said he thought "interest" meant inheritance. He didn't think he had an interest because he told his brother he didn't want any of his

inheritance in the Ashland Property. This testimony was contradicted by that of
Debra. She said she and Mark knew a deed was needed to transfer property.
The Ledins discussed transferring the property to Brian but never acted to
transfer it. (ECF No. 32-19 at 16, lines 6-15.)

The Ledins finally came to the explanation at trial that they provided the
necessary information to their prior counsel. It isn't their responsibility, they
say, if the information on the schedules was wrong. It was the fault of their
lawyer. He and Mark had known each other since high school and the lawyer
had visited the Cabin many times over the years. The lawyer didn't check
properly when Debra mentioned there was a family cabin they visited. Debra
claims he checked some website and said it listed only Brian's name. She now
concludes that meant they didn't own it.

These recent arguments that it was the lawyer's fault are unconvincing.
The Ledins say they reviewed the schedules, though briefly, before they signed
them. They were asked at the 341 Meeting whether they were true and correct,
and they answered yes. They testified the schedules had no errors or omissions
and that everything they owned was listed. (ECF No. 32-2.)

The ownership interests were, for several months after the bankruptcy
filing, concealed. In this sense, the Debtors did "fail . . . to divulge information
to which creditors were entitled." It was not until Jones pursued the
undisclosed real estate that the Ledins filed an amended Schedule A/B
disclosing these interests. That said, amending the schedules to disclose the
interests goes to intent, not concealment. *Layng v. Sgambati (In re Sgambati),*

9

584 B.R. 865, 872 (Bankr. E.D. Wis. 2018) (stating that "[a] small number of
initial omissions may not warrant denial of discharge, where there is no
evidence of intent to defraud, or no pattern of omission"). Although small in
number, the interests were not insignificant.

None of these varying justifications change the fact that the interests
were concealed. The Ledins say:

- They reviewed the schedules.

- The schedules were true and correct.

- No changes or corrections were needed.

- Although they knew Mark inherited an interest in the Cabin, it
  didn't need to be listed because an interest simply means where
  they go.

- An interest and a legal interest are two different things. The
  former simply being a place they go so there's no need to disclose.

- Signing an agreement claiming ownership doesn't really mean you
  are an owner. It merely says you have a dispute about legal
  ownership.

- They should be excused because no one asked them why they
  didn't disclose the interests in the Cabin or Ashland Property.

- Brian lives in the Ashland Property, so they consider it his and
  intended that it be his.

- They "felt" they didn't own the Cabin, so Debra said that was the
  reason she said so in a note to the UST.

- The Ledins knew about inheriting the Ashland Property, but
  because they denied seeing a deed it didn't have to be listed.

- It was all the fault and responsibility of the deceased lawyer.

The prevarications of the Ledins throughout the testimony at the 341
Meeting, the Rule 2004 Exam, the Depositions, and at trial show the lack of
trustworthiness in their explanations. When confronted with information and
documents, they changed their explanations to say they misunderstood what
an interest means. Yet they still maintained they had no interests in the
properties. Ultimately, the explanation was that the lawyer didn't do his job,
the bankruptcy was overwhelming, or the meaning of questions wasn't
explained.

Their ever-changing and often conflicting testimony demonstrates a
continuing search for any excuse they could posit. When it became irrefutable
they had failed to be forthcoming in their disclosures, the final excuse was to
blame the now deceased lawyer for all the failures and try to avoid any
responsibility. Saying they believed the Ashland Property belonged to Brian or
that they had given it to Brian is unavailing to determine concealment. The
Ledins both hold college degrees and seem knowledgeable enough to read, to
understand the schedules and statement of financial affairs, and to respond to
questions posed. The testimony about the Cabin that claiming ownership isn't
the same as owning it or that they didn't understand the meaning of the word
"interest" lacked any credibility.

This element is satisfied. The Ledins concealed the interests in the Cabin
and the Ashland Property.

### 2. *The Concealed Assets Are Property of the Debtor's Bankruptcy Estate.*

The ownership interests in the two properties fall under "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This element is satisfied.

### 3. *The Transfer or Concealment Occurred After the Filing of the Bankruptcy Petition.*

The concealment of property of the estate occurred after the filing of the bankruptcy petition. The Ledins did not disclose the interests on their bankruptcy schedules, nor did they disclose the interests at the 341 Meeting. Despite amending the schedules, they continued to deny any interest in the Cabin until pressed. Then they continued to deny they owned an interest because of a continuing dispute. After amending the schedules and faced with the deed to the Ashland Property, the excuse was that although there had been discussion about the property being put in the names of Mark and his siblings, he did not see the deed. Then, when his mother died, he wanted the property to belong to Brian. These excuses fail. This element is satisfied.

### 4. *Fraudulent Intent*

Fraudulent intent exists where a debtor acts knowingly or with reckless disregard for the truth and it can be established by circumstantial evidence. *Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 672 (Bankr. E.D. Wis. 2006). A display of reckless disregard for the truth, for purposes of section 727, means "not caring whether some representation is true or false." *Norton v. Cole (In re Cole)*, 378 B.R. 215, 222 (N.D. Ill. 2007) (citing *In re Yonikus*, 974 F.2d 901,

905) (7th Cir. 1992)). In determining fraudulent intent, the court should
consider the "whole pattern of conduct," and the determination often depends
on the court's assessment of the debtor's credibility.

### a) The Cabin:

Mark said he inherited or was gifted the Cabin and that he owns it with
his five siblings equally. (ECF No. 32-20 at 14, lines 12-25.) Mark says he did
not recall filing the amended Schedule A/B. Then, he says, he only became
aware that the Cabin and Ashland Property were not disclosed in the original
bankruptcy schedules during the Rule 2004 Exam. (*Id.* at 13, line 13.)

Mark knew he had an ownership interest in the Cabin. He was aware of
his interest in the Cabin *before* the UST learned of the interests and the
properties were disclosed on the amended Schedules. His denial of *any* interest
in the Cabin at his deposition is starkly different from his earlier position. He
understood he inherited an interest, but because no one told him his name was
on a deed, his inheriting it doesn't count. He acted as an owner when he
attended meetings with the other cabin owners about a land dispute. He
conveniently tried to say he did not remember signing the Agreement to resolve
the accreted land dispute involving the Cabin. But, shown the Agreement, he
admits he did sign it and that it says he is an owner of the Cabin. Still, he
denies he was an owner because claiming ownership isn't the same as being an
owner.

13

Mark's testimony that he was merely a regular visitor of the Cabin and—because there was a dispute about the land—his claiming ownership wasn't really being an owner was incredible.

Debra claims that she did bring up the Cabin to their attorney before filing for bankruptcy because she wanted him to know "it's in his family" and not necessarily that Mark held an ownership interest in it lacked credibility. (ECF No. 32-21 at 30, line 7.) Even if it were mentioned to him, she said nothing about it in the schedules or at the 341 Meeting. She says she "never gave it a thought" about ownership. She just mentioned it "because it's the cabin that we go to." (*Id.* at 31, lines 8-9.) Her testimony that she did not think it needed to be disclosed because she thought having an interest simply meant a place they went was not credible.

A debtor who asserts he has disclosed all relevant facts to his attorney, but that his attorney omitted material facts from the debtor's bankruptcy schedules, will not be shielded from a denial of discharge under section 727(a) unless the debtor can show that he "fully and fairly stated the facts" to counsel. *See Estate of Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 785-88 (Bankr. E.D. Pa. 2004). Saying that they gave the information to the lawyer but he didn't properly include it in the schedules does not explain:

- how the Ledins could read the schedules and sign them without the changes.

- why they would testify at the Section 341 meeting they reviewed the schedules and statement of financial affairs and they were true and correct.

- the incredible statements that Mark was an owner didn't mean he owned any interest and an interest isn't the same as having a legal interest.

- maintaining—after the lawyer's death—they failed to mention it earlier because they didn't want to embarrass the lawyer.

Based on the testimony, the Ledins knew or had a belief Mark owned an interest in the Cabin. They knew about inheriting an interest from his father. They did not tell their attorney of the inherited interest. Instead, if Debra's testimony is to be believed, she simply told him there was a family cabin that they visited. Debra was not believable when she described this conversation. But even if this conversation occurred, the Ledins did not fully and fairly state the facts to their counsel.

### *The Ashland Property:*

At one point, Mark stated he inherited the Ashland Property when his mother passed away. (ECF No. 32-20 at 21, line 1.) He also knew that when his father died it was suggested the property be put in the names of Mark and his siblings. For many years the Ledins contributed to expenses for this property. But because he told his brother Brian, who had been living on the property, that he "didn't want anything to do with the [Ashland Property]" after his mother's death, he must not own an interest. (*Id.* at lines 10-11.) He did nothing else to facilitate a transfer beyond making oral statements noting an intent to transfer his interest.

This property was not mentioned to the Ledins' attorney. Debra acknowledged she and Mark were planning to transfer Mark's interest in the

Ashland Property, but she says they have no claim on it. While admitting there were discussions about transferring the property, nothing was ever done about it. Debra did admit she knew there needs to be a deed "in order to sign over ownership of a property." (ECF No. 32-21 at 23, lines 2-3.)

Mark's testimony is contradictory. Mark first stated he was aware of his interest in the Ashland Property and knew he did not fully transfer his interest to his brother. He admitted that right after his father died his mother was encouraged to transfer the property to her children. He also admitted he inherited the property. His story changed at his deposition. He then claimed not knowing about any inheritance or interest in the Ashland Property.

The demeanor, convenient lack of recollection about some matters but clear recall on others, combined with the changing excuses for the failure to disclose confirmed the lack of credibility of both Ledins. At a minimum, these actions show a reckless disregard for the truth and support the conclusion of fraudulent intent to conceal the Ashland Property from their creditors and the UST.

The UST alleges that amendments to schedules to correct concealed assets "may not excise a false oath." Certainly, "[a] small number of initial omissions may not warrant denial of discharge, where there is no evidence of intent to defraud, or no pattern of omission." *In re Sgambati*, 584 B.R. at 872 (citing *A.V. Reilly Int'l Ltd. v. Rosenzweig (In re Rosenzweig)*, 237 B.R. 453, 457 (Bankr. N.D. Ill. 1999)). While there is no definition for what constitutes "a small number of initial omissions," the *Sgambati* court held that a reasonable

explanation of the omissions may negate any intent to defraud. *In re Sgambati*,

584 B.R. at 872.

The Ledins suggest there are reasonable explanations that negate any

intent to defraud. As discussed, those include:

- Their belief the Cabin was solely in Brian's name per a comment from their deceased attorney.

- They were "squatters" owning the Cabin but not the land.

- Owning is different from being a legal owner.

- There is a land dispute.

- Brian had lived in the Ashland Property for about 20 years and was completely responsible for it.

That said, these arguments have already been found to be unconvincing.

Given the totality of the circumstances, failing to disclose monthly payments to

property upkeep as well as ownership interests in two pieces of property likely

goes beyond the scope of a "small number of initial omissions." It is also worth

noting that these omissions were only corrected months after the original

schedules were filed, and only after the UST brought the omissions to the

Ledins' attention.

Finally, the Ledins admit the allegation in paragraph 56 of the complaint.

It says that "[t]he [Ledins'] continued efforts to conceal the real estate

demonstrate their intent to conceal these potential assets from the estate." The

answer filed by the Ledins says that the "[Ledins] admit the allegations in

paragraph 56 of Plaintiff's complaint." (ECF No. 20, ¶ 56.) This admission

cannot be ignored. It further supports the conclusion that the Ledins intended to conceal the Cabin and Ashland Property from their creditors and the UST.

### B. Count II:  False Oath on Bankruptcy Schedules

The second allegation arises under 11 U.S.C. § 727(a)(4), which provides that a debtor shall not receive a discharge if the plaintiff proves all five of these elements:

> (1) a debtor made a statement under oath
> (2) which was false
> (3) debtor knew the statement was false
> (4) the statement was made with fraudulent intent
> (5) the statement related materially to the bankruptcy case

*See Damon v. Chadwick (In re Chadwick)*, 335 B.R. 694, 702 (W.D. Wis. 2005).

Bankruptcy schedules are signed under penalty of perjury. The Ledins signed the schedules. The first element of section 724(a)(4) is met.

Second, it is undisputed the bankruptcy schedules were false when filed as they failed to disclose the interests in the properties as well as the funds used to help maintain upkeep of the Cabin. The second element of section 724(a)(4) is met.

Third, the Ledins were aware these statements were false. They knew about the discussions related to transferring the Ashland Property and the inheritance. Still, they told no one about that until it was discovered by the UST and Jones. Prevaricating about being an owner but not owning the Cabin and the fluctuating stories show a search for excuses about what they were aware were false statements. The demeanor and testimony of both Ledins confirmed that when one explanation was discredited, they simply came up

18

with another excuse. Testimony denying awareness of Mark's ownership interests at the time of the filing was not credible. The third element of section 724(a)(4) is met.

Fourth, fraudulent intent is found where the debtor knowingly intended to defraud or displayed a reckless disregard for the truth. Based on the testimony, the Ledins knew about Mark's interests in the Cabin and the Ashland Property. They chose not to include these on the bankruptcy schedules. They declined the opportunity to disclose at the first meeting of creditors. At a minimum, they had reason to believe Mark may have had an interest in the properties. As a result, failing to note these interests constitutes a reckless disregard for the truth.

Even assuming the alleged comment from the deceased lawyer that Brian's name was the only name on the Cabin, this ignores Mark's signature on an agreement saying he is an owner. And this does not explain the failure to list the Ashland Property, which was never brought to their attorney's attention.

Based on the "whole pattern of conduct," the fourth element of section 724(a)(4) is met.

Finally, the UST must prove that the false statements or omissions on the schedules bore, "a relationship to the bankrupt's business transactions or estate, or concern[ed] the discovery of assets, business dealings, or the existence and disposition of his property." *Richardson v. Carver (In re Carver)*, 418 B.R. 734, 744 (C.D. Ill. 2009) (citing *Bensenville Cmty. Ctr. Union v. Bailey*

*(In re Bailey),* 147 B.R. 157, 162 (Bankr. N.D. Ill. 1992)). The materiality

element is not concerned with the value of an asset. *In re Beaubouef*, 966 F.2d

174, 178 (5th Cir. 1992). Rather, it focuses on whether the "omission adversely

affects the trustee's or creditor's ability to discover other assets or to fully

investigate the debtor's pre-bankruptcy dealings and financial condition."

6 *Collier on Bankruptcy* ¶ 727.04[1][c] (16th ed.)

There is no question that accurately completing bankruptcy schedules to

reveal a debtor's assets has a direct relationship to a debtor's bankruptcy

estate and the UST's ability to discover assets that belong in the bankruptcy

case. The fifth element of section 724(a)(4) is met.

The Ledins have violated 11 U.S.C. § 727(a)(4) for making false oaths on

their bankruptcy schedules.

### C. <u>Count III:  False Oath at Section 341 Meeting of Creditors</u>

The same legal analysis under section 724(a)(4)(A) applies here when

examining false oaths made at the 341 Meeting. The Ledins were under oath

when testifying at the 341 Meeting. At the 341 Meeting they affirmed under

oath that their schedules and statement of financial affairs were accurate. They

said they disclosed all of their assets on their bankruptcy schedules. They

denied they had transferred any assets or given any property worth more than

one thousand dollars in the year before filing their bankruptcy petition.

Testimony at 341 Meetings is given under oath. The first element of

section 724(a)(4) is met.

Next, the Ledins' testimony was false. The schedules were not accurate. Not all of the Ledins' assets were disclosed. As this was a false oath, the second element of section 724(a)(4) is met.

And the testimony at the Rule 2004 Exam shows the Ledins testified at the 341 Meeting knowing the testimony was false. The third element of section 724(a)(4) is met.

Fraudulent intent is found for the same reasons as it exists for Counts I and II. So, the fourth element of section 724(a)(4) is met.

Finally, materiality. Testifying to the truth and accuracy of one's schedules has a direct relationship to a debtor's bankruptcy estate and the UST's ability to discover assets that belong in the bankruptcy case. The fifth element of section 724(a)(4) is met.

The Ledins have violated 11 U.S.C. § 727(a)(4) by making false oaths during their Section 341 Meeting of Creditors.

## CONCLUSION

For the above reasons, the Court finds that the Ledins are not entitled to a discharge as a result of their actions. The Court will deny Mark Ledin and Debra Ledin discharges of their debts under §§ 727(a)(2)(B) and (a)(4).

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be

entered.

Dated: November 19, 2021

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge